**Paul VICKERS and Imogene Vickers, his wife, Plaintiffs in Error,**

v.

**Frank HORSTER and O. J. Smith, Robt. W. Adams and O. B. Johnston, Co-Partners doing business as Adams & Leonard, Realtors, and Wm. S. Fears, Jr., Defendants in Error.**

**No. 41826.**

Supreme Court of Oklahoma.

Feb. 25, 1969.

Rollins & Combs, by L. Floyd Rollins, Collinsville, for plaintiffs in error.

Carl Pinkerton, James C. Pinkerton, Tulsa, for defendants in error, Frank Horster and O. J. Smith.

James G. Davidson, Tulsa, for defendants in error, Robt. W. Adams and O. B. Johnston, Co-Partners doing business as Adams & Leonard, Realtors, and Wm. S. Fears, Jr.

BLACKBIRD, Justice.

This action by defendants in error, Frank Horster and O. J. Smith, the latter a Tulsa abstracter (hereinafter referred to by name or as "plaintiffs") to enforce a contract to purchase a rural acreage of the plaintiffs in error, a retired former Colonel in the United States Army Corps of Engineers, now a stock farmer, and his wife (hereinafter referred to by name or as "defendants") in an area along the Rogers County-Tulsa County boundary line, affected by the building of Port Catoosa, arose out of a controversy as to the price therein agreed upon. Other defendants in error are a Tulsa real estate brokerage firm and one of its agents, or salesmen, Wm. S. Fears, Jr., who handled the transaction as the above-named defendants' agent, and were named additional "defendants" in the lower court.

The entire property (sometimes referred to as the "Vickers place") whose sale was originally contemplated in the parties' agreement, consists of defendants' home, and other improvements on the quarter-section, or 160-acre, farm on which they are located.

When the basic contract was signed on April 21, 1965, the mortgage indebtedness on the property had been reduced to $27,388.85; and the contract contemplated that the sale was to be made subject to this indebtedness. The "total purchase price" specified in the written contract is $65,000.00, of which plaintiffs delivered

the sum of $6500.00 to the brokerage firm, as indicated in the contract.

The controversy revolved around the question of whether this price included, or was in addition to, the mortgage indebtedness.

Subsequent to the signing of the basic contract, the defendant, Vickers, telephoned plaintiffs on May 5, 1965, wanting them to sell back to said defendant and his wife a 15-acre portion of the farm's northwest corner, where these defendants' home was situated. The parties' agreement that said defendants could retain that part of the farm for a total consideration consisting of $17,500.00 for the ten, of the 15, acres, on which the home and all of the major improvements were located, and an additional consideration of $500.00 per acre for the other 5 acres, and that the parties' original contract should stand amended accordingly, was incorporated in a letter dated May 7, 1965, which Vichers wrote to plaintiffs.

When the broker's salesman, Fears, presented to Vickers deeds for him and his wife to sign conveying to each of the plaintiffs an undivided one-half interest in the property covered by the parties' agreement, as amended, and a check in the amount of the purchase money shown to be due defendants for said conveyance in the "CLOSING STATEMENT FOR SELLER" (which had been prepared in the brokerage firm's office) he refused to sign the deed and accept the check.

In the present action later instituted by plaintiffs, they attached to their petition for specific performance of the parties' contract, copies of the aforesaid written contract of April 21, 1965, the aforementioned letter-agreement dated May 7, 1965, amending it, the aforementioned CLOSING STATEMENT, and the aforementioned deeds.

By cross petition, the real estate brokers sought judgment against the Vickers for a brokerage fee of $3900.00, which they alleged, in substance, the Vickers agreed to pay them under the contract of April 21, supra.

In the Vickers' cross petition, which accompanied their answer in the form of a general denial, they indicated that the reason they refused to execute the deed and accept the check presented to them to close the transaction, was that it was their understanding that, according to the parties' contract of April 21, supra, plaintiffs agreed to pay them (at the rate of) $65,000.00 for their equity in the property, and that this was to be paid by plaintiffs in cash, in addition to their assumption of the mortgage indebtedness of $27,388.85. The court later dismissed this cross petition, however, on said defendants' motion, and the only pleading, upon which they went to trial, was their answer of general denial.

The written portion of the printed-form contract, whose interpretation was the sole issue in the controversy, appears in the context of the document (which was introduced in evidence at the trial) as follows (written portions indicated by dots beneath):

"This is to acknowledge receipt from FRANK HORSTER and O. J. SMITH purchaser, whether one or more, of the sum of $6,500.00 for the benefit of PAUL VICKERS, seller, whether one or more, as part payment on the purchase price of the following described real estate situated in Rogers County, State of Oklahoma, to-wit:

"Northwest Quarter (NW/4), Section Twenty-Two (22), Township Twenty-One North (21N), Range Fourteen East (14E), of the Indian Base and Meridian.

together with all improvements thereon, if any, in their present condition, ordinary wear and tear excepted.

"Upon approval hereof by both purchaser and seller, which shall not be later than one day from date, a valid and binding contract of sale between the seller and purchaser shall exist, the terms of which are as follows:

"The total purchase price is $65,000.00, payable as follows:

$6,500.00 hereinabove receipted for, $58,500.00 payable upon delivery of deed as herein provided.

"Purchaser to assume 1st Mortgage balance of approximately $27,388.83. Balance cash upon delivery of deed.

"THE FOLLOWING CONDITIONS ARE TO APPLY TO THIS SALE:

"1. Seller within 10 days after approval of this contract shall furnish purchaser an abstract of title certified to date, showing a good and merchantable title in the seller, subject to easements, building restriction of record and the above mortgages, if any.

\* \* \*

"APPROVAL OF PURCHASER:

"I (we) hereby agree to purchase the above property and pay the price of $65,000.00 in accordance with the above terms.

"DATED THIS 21st day of April, 1965.

/s/ O. J. Smith
/s/ Frank (?) Horster

"APPROVAL OF OWNER AND SELLER:

"I (we) hereby accept the terms of purchase set out above and acknowledge that the same is a binding contract; and upon closing of the sale or upon breach by buyer or seller I (we) agree to pay forthwith to the above named REALTOR the regular commission recommended by the Tulsa Real Estate Board for the services rendered and to be rendered in this transaction.

"DATED THIS 21st day of April, 1965.

/s/ Paul A. Vickers
/s/ Imogene Vickers."

———◆———

Besides the above stated facts that were established at the trial, Mr. Fears, the above named real estate salesman, testified, in substance, that Vickers telephoned

his firm in 1965, and informed him that he wanted to sell his farm; that he (the witness) thereafter went to the Vickers' home about the middle of that month, where the proposed sale and price were discussed, and the listing taken orally; that Vickers told him the price was $65,000.00 for the farm; that the witness was already generally familiar with the farm, and thought that was a fair price for it; that he (the witness) already had one east of it listed with him for $350.00 per acre; that, at that time it was known that Port Catoosa would be established; that the Mingo Valley Expressway, extending through that area was already open to traffic as far as the north edge of Owasso, and it was known that a water district would be functioning in that area; that all of these developments were taken into consideration in arriving at the witness's opinion of the price; that Vickers didn't mention anything at that time about whoever purchased the farm assuming the mortgage, but that, when the witness asked him if there was a mortgage on the property, Vickers stated: " * * * yes, there is a real good mortgage on it, 5 percent interest and annual payment. 5% note."

Later, in his rebuttal testimony, Fears testified that when Vickers told him he wanted $65,000.00 for his property, he further mentioned that: "A man tried to buy it for $60,000.00, but I wanted $65,000.00."

The transcript of this witness's testimony, while he was testifying for the cross petitioning brokers, indicates that the rules and regulations for real estate brokers in Tulsa was introduced in evidence, and his testimony indicates that the fee, cross petitioners sought, was the usual one (apparently 6% of the purchase price).

Fears further testified that, after he took the listing, he advertised the property in the Tulsa newspapers over a period of several weeks; that the terms and price of the proposed sale was set forth therein. (These advertisements were not introduced in evidence). Before being interrupted by an objection of opposing counsel, Fears testified that, in refusing the purchase price check the witness tendered him, Vickers stated: "Well, I believe there has been some mistake."

As a witness on behalf of himself and his wife, the defendant Vickers testified, among other things, that he had a degree from Harvard University in business administration, and that, during the 32 years he served in the United States Army's Corps of Engineers, he had experience not only in engineering "but in what might be called office work in checking estimates and contracts and things of that nature." He further testified that, when Mr. Fears presented the contract of April 21st, supra, to him, he "read the entire instrument and pointed out the cash balance remaining in that entry." Mr. Vickers further testified that he was chairman of the organizational committee that formed the water district east of Owasso, in February, 1965, and that he is now on said district's Board of Directors.

Later, when interrogated concerning the gist of his discussion with Fears, when the property was listed with him for sale, Vickers testified:

"A. We discussed the facts and sundry improvements on the place and the lie of the land, and we got around to discussing about how much and at that time I told Mr. Fears there was a balance, a loan on the property of $27,388.-85 that was to be assumed and I wanted $65,000.00, my part of this property."

Upon motion of opposing counsel, the latter part of this answer was stricken.

Most of the other testimony introduced on behalf of the plaintiffs and cross petitioners was in the nature of expert testimony concerning property values in the area, and was contemplated to show that the August 21st contract's "total purchase price" of $65,000.00, or $406 (and some cents) straight "across the board" for all of the 160 acres (improved and unimproved alike) was a fair market price for same.

When the plaintiffs, and the cross petitioners first rested, defendants demurred to plaintiffs' evidence, but this demurrer was overruled.

After defendants had introduced their evidence, including the testimony of witnesses acquainted with real estate values in the area, and contemplated to show that defendants' farm was worth more than the $65,000.00 set forth in the written contract, plaintiffs called three rebuttal witnesses. One of these, a Mr. Tucker, testified, in substance, that he knew the defendants, that he was familiar with the Vickers place, that he was out there the first time in March (1965) and tried to buy it. Describing his negotiations with Vickers, this witness testified in part as follows:

"Q Had you made him an offer.

"A Yes sir.

"Q What was that offer.

"A $57,000.00.

"Q And he rejected that. And asked for $65,000.00.

"A Yes sir.

" * * *

"Q Was there any discussion as to whether there was a mortgage against the place.

"A Yes, sir, in the last part of the discussion there was.

"Q Was the $65,000.00 the total price.

"A Total price, Yes sir.

"Q And clearing the mortgage had to come out of the $65,000.00.

"A That's right.

* * * * * *

"Q Can you state in what way.

"A Frankly, I asked him how much money back he would carry. * * * he said he would rather have the $65,000.00 in cash, but it had a real good mortgage on it. The mortgage was 5% and we could assume it if we wanted to.

* * * * * *

"Q Are you certain about this mortgage question, did you go into how much cash you would have to raise and go into that with him.

"A I am sure I did, because I went into the bank the following morning to raise the money. * * *."

In his "DIRECT-SUR-REBUTTAL" testimony, the defendant, Vickers, thereafter corroborated that part of Mr. Tucker's above quoted testimony to the effect that he had rejected Tucker's offer, but he denied that he had ever offered the property to Tucker "for $65,000.00 less the customary real estate commission."

When the case was thereafter submitted to the court, without challenge, on the part of either party, to the sufficiency of the evidence as a whole, judgment was rendered for the plaintiffs and for the cross petitioning real estate brokers.

After defendants' motion for a new trial was overruled, they perfected the present appeal.

■ As "Grounds For Reversal" defendants' initial brief sets forth six assignments of error contained in their above mentioned motion for a new trial. As to those numbered "1" and "3", alleging the insufficiency of plaintiffs' petition, and of the real estate brokers' cross petition, to state any cause, or causes, of action against them, we find in the record no predicate in the form of any kind of a motion, or demurrer, challenging the sufficiency of the pleadings. Attempting to raise such issue in their motion for a new trial came too late. See Beam v. Farmers' & Merchants' Bank, 104 Okl. 158, 230 P. 881; Lipscomb v. Adamson Lumber Company (Tex.Civ.App.) 217 S.W. 228, and other cases cited in 4 C.J.S. Appeal and Error § 345, footnote 68.

■ Nor does defendants' fifth ground for reversal, i. e., that the trial court erred in overruling the heretofore mentioned demurrer to plaintiffs' evidence present any

predicate for reversal, since evidence was thereafter presented on behalf of both adversaries. In Logan v. Logan, 197 Okl. 88, 168 P.2d 878, this court held:

"Where defendant interposes a demurrer to plaintiff's evidence and after said demurrer is overruled introduces his own evidence, the trial court's judgment will not be reversed on account of the alleged error in his ruling on the demurrer if the judgment is supported by the evidence as a whole."

In view of the above, defendants' complaints, under their second and sixth propositions for reversal, reach only the question of whether the interpretation of the parties' contract, which inheres in the trial court's judgment for specific performance, is contrary to law or established principles of equity, or is clearly against the weight of the evidence. See Whitaker v. Town of Tipton, Okl., 426 P.2d 336, and King v. Gant, 77 Okl. 105, 186 P. 960. Defendants charge that plaintiffs' position that $65,-000.00 was the "total purchase price" of the property under the base contract is "inconsistent" with the deduction therefrom of the mortgage indebtedness (which plaintiffs therein agreed to assume) and with the contract's provisions as to the abstract defendants were to furnish. They cite certain cases, and quotations from Corpus Juris Secundum, which, while appearing to be in accord with established abstract principles of law, do not demonstrate the correctness of their position, nor convince us that the judgment in this case does not meet the test set forth in the Whitaker case, supra.

We have thoroughly examined the record and are of the opinion that the trial court's judgment is neither contrary to law nor clearly against the weight of the evidence, nor contrary to principles of equity. In this connection, notice Fair Oaks Building & Loan Ass'n of Leet Township v. Kahler, 320 Pa. 245, 181 A. 779, 781, 111 A.L.R. 1108.

The above conclusion sufficiently disposes of defendants' remaining arguments, under their "PROPOSITION 4", that the cross-petitioning brokers were not shown to be entitled to the fee, or commission, awarded them in said judgment.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

All the Justices concur.